Daniel W. McCarthy and Anne D. McCarthy (Husband and Wife) v. Commissioner.
McCarthy v. Commissioner
Docket No. 55586.
United States Tax Court
T.C. Memo 1957-194; 1957 Tax Ct. Memo LEXIS 53; 16 T.C.M. (CCH) 879; T.C.M. (RIA) 57194; October 17, 1957
*53 Joseph A. Struett, Esq., and Herbert M. Hauptman, Esq., for the petitioners. Andrew Kopperud, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions to tax as follows: Additions
Section
Section
Year
Deficiency
293(b)
294(d)
1944
$ 671.44
$335.72
$ 99.00
1945
631.35
315.68
103.17
1946
1,355.95
677.98
197.06
1947
1,061.44
530.72
169.83
1948
$ 596.64
$298.32
$ 93.57
1949
845.34
422.67
135.25
1950
408.60
204.30
61.94
1951
1,178.76
589.38
191.60
The questions presented in this case are: (1) Whether petitioners understated adjusted gross income received by them during the taxable years as determined by the respondent and the amount of such understatement, if any, and (2) whether any part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. In the absence of fraud, adjustments to the taxable years 1944 to 1948, inclusive, are barred by the statute of limitations. The petition raises an issue in regard to the additions pursuant to section 294(d)(1)(A) and 294(d)(2), Internal *54 Revenue Code of 1939, but petitioners have abandoned this issue, as there was no mention of it at the trial and the record does not include any evidence in regard thereto. Findings of Fact Petitioners are husband and wife residing during the taxable years 1944 through 1951, inclusive, in Chicago, Illinois. Their joint income tax returns for the taxable years here involved were filed with the collector of internal revenue for the first district of Illinois. Petitioner husband, hereinafter sometimes referred to as petitioner, was born in Chicago, Illinois, on January 23, 1892. His schooling consisted of grammar school, 2 years of high school, later attendance at night high school, and a 6-months' secretarial course at the Chicago Law School, Secretarial Division. Petitioner worked as a clerk for the Illinois Central Railroad from 1907 until 1918. After a short period of service in the Army in 1918 he worked as a room clerk in various Chicago hotels, and as assistant manager of several clubs in and around Chicago from 1919 to 1923. From 1923 to 1941 petitioner had seasonal employment as assistant technical director of the Chicago Civic Opera at a salary of $50 a week. He was and *55 is a member of the International Alliance of Theatrical Stage Employees and Motion Picture Operators. As a result of this employment and his membership in that union, petitioner knew many people in the entertainment business in Chicago, and by virtue of his acquaintanceships he was able to obtain tickets to practically all entertainment events held in the city of Chicago. From May 1941 to November 1942 he earned $120 a month as an employee of the Selective Service Board in Hollywood, California. From May 1943 until August 1943 he was employed as an assistant property man for Columbia Studios, Hollywood, California, at a salary of $65 a week. Until June 5, 1943, petitioner was a bachelor. His living expenses were negligible and his habits were extremely frugal. He was able to save, and did save and invest a considerable sum of money. Petitioner filed income tax returns in Chicago, Illinois, for the years 1937 and 1938; he did not file income tax returns for either 1939 or 1940 because his net income in each of these years was between $700 and $800. His income tax returns for 1941 and 1942 were filed in Los Angeles, California. Petitioner married Anne Macaluso on June 5, 1943. Anne *56 was a Chicago girl, 21 years younger than petitioner. Anne's parents were of Italian origin. They owned jointly a large 2-family apartment house and another house. Anne began earning money at the age of 14 playing the piano in a bible school. After attending high school and commercial school, she became a seamstress apprentice and later a dressmaker at a ladies' apparel store. With the encouragement of her mother she began to save money at an early age, and by the time of her marriage she had a substantial savings account and also owned some stock. When petitioner and Anne were married, they moved in with Anne's parents and occupied a room in their 7-room apartment. They paid the parents of Anne nothing for rent, but performed work with regard to the building of a type customarily performed by a janitor. They paid for the telephone and contributed to the purchase of food. A son was born to petitioner and Anne in 1944 and a daughter in 1947. The bill of the doctor assisting Anne in her first confinement was $75, and the doctor's bill in connection with her second confinement $100was. Petitioner and Anne continued to live with the parents as one family throughout all of the taxable *57 years, but after the birth of the children their contributions to the communal living expenses increased. In 1944 Anne's mother was 64 years old and her father was 66. During the latter part of the taxable period the father was retired on a small pension, and both he and the mother received social security payments. Anne's family was a large one. She is the youngest of five brothers and sisters. At the time of her marriage she received considerable amounts of cash as wedding presents. At the end of 1943 she had unbanked cash from this source in the approximate amount of $400. After the birth of her children they received cash presents from relatives on the occasions of their birthdays and other holidays in the approximate amount of $100 each per annum, which were deposited in petitioner's savings accounts. Anne, being a seamstress, made many of her own clothes and clothes for her children. The latter were frequently made over from family "hand-me-downs." The children also used a crib, playpen, and kiddie car which were passed on to them from other members of Anne's family. Petitioner was frugal to the point approaching miserliness. He made arrangements with stores whereby he *58 could purchase at bargain prices clothes and shoes which, on account of minor defects, could not be sold at regular prices. He obtained as many free rides to and from work as possible. He ate cheap lunches and read one newspaper a day. He did not smoke and took few, if any, vacations. It being widely known that petitioner, on account of his connections, could obtain hard-to-get tickets for entertainment events, he was frequently called upon for such services during the taxable years and received remuneration therefor. During this period he was also paid for assisting taxpayers in the preparation of their income tax returns. Since he refused to accept these payments directly, they were made in the form of "gifts" to his children and then deposited in one of his bank accounts. On or about August 16, 1943, petitioner applied for a job with the Internal Revenue Service (then the Bureau of Internal Revenue) at Chicago. As a part of an investigation conducted by the intelligence unit of the Service, petitioner prepared on September 1, 1943, the required financial statement of applicant. This statement included only his assets and showed the following information: Cash on hand
$ 700
Cash in bank, checking account
1,100
Cash in bank, savings account
2,600
Government bonds
9,000
Estimated present market value of
stock
2,000
Personal effects (jewelry, furniture,
etc.)
500
*59 He listed no accounts receivable, no notes receivable, no real estate, no mortgages receivable, no cash surrender value insurance, no automobile or other assets, and no liabilities of any kind. He certified that this financial statement was a complete and accurate account of his assets and liabilities and that his approximate net worth was $15,900. McCarthy was employed by the Internal Revenue Service on September 1, 1943, and he was so employed until November 30, 1954. He enrolled in and completed numberous correspondence courses in accounting and Federal income tax that were given by the Service to its employees, and he was periodically assigned to assist taxpayers in completion of income tax returns as a part of the taxpayer assistance program of the Internal Revenue Service. In 1951 the Treasury Department decided that for the best interest of the Internal Revenue Service it would be desirable to require the periodic filing of financial statements by some of the Service personnel. McCarthy was one of the personnel who was required to file such a statement and he did so in November 1951. His financial statement showed no liabilities and listed the following assets and net worth *60 totaling $54,880.10: Assets
Cash in Banks
Savings Accounts
First National Bank of Chicago
(Anne or Daniel McCarthy)
$ 6,273.90
First National Bank of Chicago
(Anne Macaluso McCarthy)
4,607.51
Lake View Trust & Savings Bank
(Anne or Daniel McCarthy)
2,738.31
Chicago National Bank (Daniel
McCarthy)
5,157.43
Bank of Chicago (Daniel Mc-
Carthy)
4,501.00
Continental-Illinois Bank (Caniel
McCarthy)
6,306.06
Checking Account
First National Bank of Chicago
(Daniel McCarthy)
1,000.00
Cash anywhere else
None
Due from others - Loans, etc
None
Automobiles - Acquired 11-1-50
1,612.00
Securities
Crane Co. - Acquired in 1933
$ 1,250.00
Commonwealth Edison - Acquired
1931-1937-1950
2,988.22
Toledo Edison - Acquired 1950-1951
1,050.00
Cities Service - Acquired 1929
2,996.25
U.S. War Bonds - Acquired 1949-
1950
10,125.00
Cashier's Checks - First National
Bank of Chicago
2,000.00
Real Estate
None
Cash surrender value of life insurance
$ 274.42
Personal effects and household fur-
nishings
2,000.00
Other assets
None
$54,880.10
The same statement also listed receipts and expenditures for the years ended December 31, 1949 and *61 1950, as follows: Year ended
Year ended
12-31-49
12-31-50
Receipts
Your gross salary
$3,757.63
$ 4,070.17
Your income from outside business or employment
None
None
Spouse's gross income from business or employment
237.00
362.15
Commonwealth Edison dividends
61.00
88.00
Cities Service dividends
38.50
55.00
Crane Co. dividends
100.00
130.00
Wacker Corp. profit on sale of stock
361.12
Toledo Edison Co. dividend
3.86
Bank interest on savings
94.70
302.36
Redemption of U.S. Bonds
10,000.00
Total Receipts
$4,649.95
$15,011.54
Expenditures
Family and household expenses (Food, heat, clothing, utilities, tele-
phone, domestic help, minor household repairs and improvements)
$3,500.00
$ 3,650.00
Rent or payments on dwelling
None
None
Recreation (Entertainment, clubs, vacations, travel, summer camps,
etc.)
580.00
360.00
Insurance premiums
147.77
255.38
Retirement deductions
225.68
244.12
Federal income taxes
193.60
262.80
Gifts and charitable contributions
300.00
300.00
Automobile purchase, repairs and maintenance
1,800.00
Investments and savings (Real estate, stocks, bonds, etc.)
Stock
1,774.22
U.S. Government bonds
168.75
7,612.50
Others (Itemize any expenditure in excess of $200.00 for household
furnishings, jewelry, silverware, paintings, tuition of children and
room and board away from home in school, wagering losses, taxes
other than Federal income, medical and dental bills, interest paid,
repayment of loans, other than mortgage on dwelling, etc. Minor
expenditures can be grouped under heading "Miscellaneous")
Piano
427.89
Total Expenditures
$5,115.80
$16,686.91
*62 The statement was signed by petitioner who certified that it was complete and correct to the best of his knowledge and belief. It also stated that petitioner had rented a safedeposit box since January 1, 1949, in the Bank of Chicago and that there was no cash in such box. This statement was incorrect in that it overstated petitioner's expenditures. Petitioner's reason for making this incorrect statement was his disinclination to publicly acknowledge what a stingy skinflint he was. Petitioner at a later date disavowed the personal and family expenses as listed on the 1951 financial statement submitted to the Service. He provided the respondent with an amended statement of these living expenses, as follows: Yearly
Food (Groceries, etc.)
$1,300.00
Telephone - Telegraph
54.00
Laundry - Dry Cleaning
12.00
Auto Expense
80.00
Transportation (Carfare)
25.00
Education
20.00
Magazines - Papers - Books
25.40
Insurance
305.10
Dues (Club, Lodge, Union)
46.00
Personal (Tobacco, Liquor, Lunches,
etc.)
130.00
Taxes
Federal
$ 587.80
State
90.00
Contributions
50.00
Gifts
20.00
Other - Barber Shop - Beauty Salon
30.00
$2,775.30
A comparison between *63 petitioners' financial statements of 1943 and 1951 indicated that petitioners' net worth in 1951 exceeded McCarthy's individual net worth as disclosed in his statement of 1943 by over $30,000, whereas their total reported gross income, less Federal income taxes of about $2,700, amounted to approximately $32,600. Therefore, the respondent instituted an investigation to determine the possibility of some income tax liability. Using McCarthy's estimates for his family living expenses for the years 1949 and 1950, as shown on the 1951 financial statement, as a basis for an estimate of the living expenses for the other taxable years, the respondent made a net worth determination of petitioners' income for the years 1944 to 1951, inclusive. In this net worth determination the respondent used cost figures rather than current market values of various stocks and added in certain assets owned by Anne McCarthy on December 31, 1943. Petitioners did not claim any liabilities to exist in any of the taxable years. A revised "Statement of Computed Net Worth and Adjustments to Income" of petitioners for the years ended December 31, 1943, to December 31, 1951, inclusive, was prepared by respondent and *64 introduced in evidence herein as exhibit "O". We incorporate that exhibit herein by this reference. It differed in some respects from the original net worth determination. With regard to most of the items appearing therein petitioners were in agreement. As to those items upon which the parties were not in agreement, we make the following findings: 1. Petitioner had cash on hand in the amount of $700 on the last days of 1943, 1944, and 1945. 2. Petitioner had additional cash on hand on the last days of 1943, 1944, and 1945 in the amount of $1,115.94, representing the proceeds of Armour & Co. stock received by petitioner in 1943. 3. Anne had cash on hand on December 31, 1943, in the amount of $400, representing wedding gifts which she had not deposited. 4. Other cash held by Anne in 1943 and the taxable years did not fluctuate materially in amount from year to year, and therefore need not be considered in the computation of net worth. 5. Petitioner had no cash on hand after December 31, 1945. 6. There was a loan due to petitioner from his brother upon which there was a balance due of $500 on December 31, 1943, and a balance due of $250 on December 31, 1944. 7. There was *65 no material increase in petitioners' "personal possessions" during the years here in question. 8. The only television set owned by petitioners was bought in 1951 at a cost of $250. 9. Of the increase in petitioners' net worth in each of the years 1944, 1945, and 1946, $100 was due to the receipt and deposit of gifts made to petitioners' son. 10. Of the increase in petitioners' net worth for 1946, $500 was due to the receipt by Anne of a gift in this amount from her mother. 11. Of the increase in petitioners' net worth for each of the years 1947 to 1951, inclusive, $200 was due to the receipt and deposit of gifts to petitioners' children. 12. Petitioners' living expenses (exclusive of Federal income taxes paid) were $1,500 for each of the years 1944, 1945, and 1946, $1,800 for each of the years 1947, 1948, and 1949, and $2,100 for each of the years 1950 and 1951. With the exception of the items upon which we have made the above specific findings, we find the items set out and adjustments made in exhibit "O" to be correct. Accordingly, we find that the annual increase in petitioners' net worth for the taxable years, due to retained income, was as follows: 1944
$1,425.64
1945
2,170.51
1946
1,599.36
1947
4,811.25
1948
2,828.71
1949
4,241.60
1950
3,538.44
1951
4,530.29
*66 Petitioners' total gross income for the taxable years was as follows: 1944
$3,326.34
1945
4,024.31
1946
3,476.16
1947
6,066.80
1948
4,865.51
1949
$6,223.40
1950
5,922.64
1951
7,060.87
Petitioners' adjusted gross income for the taxable years was as follows: 1944
$3,326.34
1945
4,024.31
1946
3,476.16
1947
6,001.54
1948
4,865.51
1949
5,862.28
1950
4,255.97
1951
6,560.87
Petitioners failed to report income for the years 1944, 1945, 1947, 1948, 1949, and 1951 as follows: 1944
$ 29.18
1945
376.35
1947
545.30
1948
665.61
1949
1,212.33
1951
663.32
Petitioners overstated their income reported for the years 1946 and 1950 in the respective amounts of $654.53 and $755.57. The overstatement for the latter year is due to an adjustment made by respondent to petitioners' gross income by deducting therefrom $1,666.67 explained as "Tax exempt interest - Savings bonds." Petitioners received interest on their savings accounts for the years 1944 to 1951, inclusive, as follows: 1944
$ 69.09
1945
73.76
1946
154.69
1947
151.68
1948
209.92
1949
276.06
1950
340.56
1951
350.69
*67 Petitioners also received taxable interest income from United States Savings Bonds in 1950 in the amount of $833.33, which they failed to report as income. Petitioners failed to report the following amounts of interest in the income tax returns for the years 1944 to 1951, inclusive: 1944
$ 60.17
1945
28.52
1946
102.19
1947
20.31
1948
103.58
1949
181.36
1950
38.20
1951
29.79
In petitioners' income tax returns for the years 1947 and 1948 they reported dividends of $72.50 and $103.81, respectively, but they failed to report dividends in the amounts of $131 for the year 1947 and $138.69 for the year 1948. In 1947 and 1949 petitioner reported the receipt of only that amount of interest and dividends which would result in the amount of tax shown to be due on the returns being equal to the penny to the amount of tax withheld. Joseph Macaluso, petitioner's father-in-law, owned in joint tenancy with his wife the real property located at 3620 North Magnolia Avenue, Chicago, Illinois, during the years here involved. Petitioners lived in this property rent-free. In each of the years 1949, 1950, and 1951 the gross income from this property was $1,080. Joseph *68 received a taxable pension of $288 a year and also had interest and dividend income. He and his wife had net taxable income in 1949, 1950, and 1951 of at least $978.52 and, in addition, social security benefits in each year of $1,000. The only support provided by petitioners for Joseph was food costing between $200 and $300 a year. Petitioners were not entitled to claim Joseph Macaluso as a dependent in the years 1949, 1950, and 1951, and McCarthy knew that they were not when he filed the returns in which such claim was made. Petitioners executed consents extending the period of assessment of income taxes for the years 1949 and 1950. The returns for the taxable years 1947, 1948, 1949, and 1951 were false and fraudulent with intent to evade tax. A part of the deficiency due from petitioners for each of the years 1947, 1948, 1949, and 1951 is due to fraud with intent to evade tax. Opinion KERN, Judge: A large part of petitioners' argument is devoted to an attack upon the propriety of the administrative policy and procedures employed by respondent prior to and leading up to the determination made herein and, also, to an attack upon the motives of respondent in making this determination. *69 These are matters which are outside our jurisdiction. Charles Crowther, 28 T.C. - (September 30, 1957). The questions before us in this proceeding are all questions of fact which have been resolved in our findings, after a careful study of all of the evidence and a consideration of the arguments of counsel. With regard to most of these questions, it would be unprofitable to discuss in detail the evidence which has led us to our conclusions. However, concerning a few of these findings, a few words of explanation may be appropriate. Our finding as to petitioners' living expenses (an issue concerning which there was a large volume of testimony) may appear to be in surprisingly low amounts, especially in view of petitioner's own statement made in 1951 which set out his living expenses in considerably larger amounts. Having heard and carefully studied the testimony on this issue and having observed both petitioners on the witness stand, we are convinced that the amounts recited by McCarthy in this statement were overstated and that these overstatements were caused by his reluctance to disclose how frugally he and his wife lived. Petitioner impressed us as having an odd personality which *70 contained an unusual combination of childishness and sly cunning. We are also of the opinion that petitioner was almost as stingy and miserly as his counsel portrays him to be. In making the 1951 statement as to his living expenses, we think that the childish element in his personality predominated and that, without considering in a reasonable way the possible serious consequences to him, he suppressed the truth with regard to his living expenses in order to suppress another unpleasant truth, namely, that he was a "cheapskate" and "skinflint." However, when he made the second statement as to his living expenses later in the course of the investigation into his affairs and with full knowledge of the purport of that investigation, it is inconceivable that he would materially overstate these expenses. We have taken this second statement as the basis for our determination on this issue, adjusting it downward a bit in view of the testimony of both petitioners and in recognition of increases in the cost of living in later years, and increases caused by the purchase of the automobile. We have carefully considered petitioners' argument that their cost of living throughout all of the years *71 was considerably less than that stated in petitioner's second statement, and even less than the cost of living found by us. This argument is rejected because it is inherently improbable, even under the peculiar circumstances of petitioners' living arrangements, because of the sometime vague and contradictory testimony of petitioners, and because it is contradicted by petitioner's second statement which, in our opinion, is substantially accurate as of the date it was given. We have also rejected as implausible and completely uncorroborated petitioner's testimony that he had cash on hand as of December 31, 1943, in excess of the $700 claimed by him in September 1943, plus the proceeds of the Armour & Co. stock in the amount of $1,115.94. We accept his testimony that he had these amounts of cash and did not deposit them until 1947, since, to some extent, this is corroborated by his bank accounts. With regard to the fraud issue, we have found fraud as to the years 1947, 1948, 1949, and 1951. With regard to these years, we think that fraud has been proved by the following considerations: 1. Although the failure to report interest and dividends in prior years may be considered as a *72 careless oversight, in 1947 it appears that this failure was deliberate since for this year the amount of tax shown due on the return was equal to the penny to the amount of tax withheld, which is striking corroboration of testimony that petitioner admitted adjusting his reported income from these sources in order to obtain this spectacularly unusual result - a result which would undoubtedly cause pleasure to one as childishly cunning as petitioner. This was done again by petitione in 1949. We conclude that for 1947 and later years petitioner's failure to include all of the income from these sources in his returns was deliberate and fraudulent. In this connection we note in passing that we ascribe no significance to petitioner's failure to report interest on United States Savings Bonds. 2. Petitioners' claim to a dependency exemption on account of Joseph Macaluso in 1949, 1950, and 1951 was obviously without foundation. For petitioners, who had obtained shelter rent-free from Macaluso and his wife for many years and, undoubtedly, many other advantages, including a gift of $500 from Mrs. Macaluso, and the use of her television in 1949 and 1950, to claim Macaluso as a dependent, with *73 full knowledge of his income and their own small contributions, if any, to his support, would be shocking enough under any circumstances, but when it is considered in the light of petitioner being an agent in the Internal Revenue Service with a demonstrated knowledge of tax laws and regulations, we can only conclude that it amounted to deliberate fraud on his part. 3. There was a failure in each of these years to report income in amounts which were large in proportion to the income reported. Petitioner admitted on the stand that he received money from persons for whom he obtained hard-to-get tickets to various entertainment events. Respondent's agents testified that petitioner admitted that taxpayers to whom he had given assistance in making out returns had proffered payments to him and, when he refused to accept them, had made "gifts" to his children which he deposited in his bank accounts. These sources of unreported income are shown by the record and, in our opinion, there is affirmative and convincing proof that petitioners failed to report taxable income in the years 1947, 1948, 1949, and 1951 in amounts ranging from approximately 10 per cent to approximately 30 per cent of *74 the amounts reported. Our reasons for not finding fraud with regard to the years 1944 to 1946, inclusive, are as follows: (1) There is no corroboration of the deliberate omission by petitioners of income from dividends and interest from their returns; (2) petitioners made no claim to a dependency exemption on account of Joseph Macaluso in any of those years; and (3) the understatement of income in 1944 was in a de minimis amount, and understatement of income in 1945 was in an amount less than the overstatement in 1946. We have concluded that as to these years respondent has not borne successfully his burden of proving fraud. At the time of the trial petitioners made certain motions, all addressed to the inadequacy of respondent's proof. The matters raised therein have been considered by us in making our findings. As motions they should be and are hereby denied. Decision will be entered under Rule 50.